Downey, Judge,
delivered the opinion of the coui*t:
The plaintiff was a cost-plus contractor for the erection of a quartermaster terminal at Philadelphia, Pennsylvania. During the progress of the work Lieutenant Colonel E. B. Morden, of the Quartermaster Corps, was in charge as construction quartermaster and was duly authorized as the l-epresentative of the contracting officer.
Colonel Morden, without consultation with the plaintiff so far as appears, took up with the fii’m of Lasette & Murphy the matter of entering into a subcontract for the plumbing work and likewise with Gillis & Geoghegan the matter of entering into a subcontract for the heating and ventilating work and prepared the contracts afterward executed between these two firms as subcontractors and the Snare & Triest Company.
There had been prepared for use and printed, forms of contract, a form for use in the making of the prime contract and a form for use in the making of subcontracts thereunder and they were so prepared that they operated together and that in some instances reference from one contract to the other was necessary for the determination of terms and conditions. Before entering into these subcontracts a representative of Lasette & Murphy and a representative of Gillis & Geoghegan had seen and examined the printed forms and so far as had been made known to them during *156 the preliminary negotiations the terms of their proposed contracts were to be as indicated in the printed form. In the preparation of the subcontracts Colonel Morden eliminated from the conclusion of paragraph six after the word “ be ” preceding “ five per cent,” the words “ taxed according to the schedule, contained in Article III of the principal contract hereto attached and shall not exceed the fee which, under said schedule would be allowed a contractor for the work hereby included, if said work had been done under a direct and separate contract,” and substituted therefor, as appears in the executed contracts, the words “ five per cent of the cost of the work as determined by Article II of the principal contract.” The subcontractors protested against the change made upon the assumption that it might change their compensation as originally provided which, predicated upon Article III of the prime contract, would be six and one-half per cent upon any amount over $125,000 and under $450,000. Colonel Morden stated to them that he had decided to limit their fees in each case to $25,000 and since the estimated amount of work to be done under each contract was $600,000 the change from six and one-half per cent to five per cent would not affect the amount of fee to be received by them since five per cent of the estimated amount of work would be in excess of the maximum fee and that the five per cent was to be used simply as the basis of progress payments. The question was then raised by the subcontractors as to the situation in the event that the work should be suspended before completion and in reply thereto Colonel Morden assured them that the work would be completed and that they would earn the maximum fee but that if it should be suspended before completion they would have recourse to the provisions of the prime contract in case of suspension since there was no specific provision therefor in the subcontracts. Upon this representation and the understanding upon the part of Colonel Morden, the Snare & Triest Company and the subcontractors that this was the construction to be put upon the contracts they were executed by the subcontractors and approved by Colonel Morden acting for the contracting officer. It might well here be stated that there is no room for controversy as to *157 the construction put upon the transaction by Colonel Morden as well as the subcontractors, for it appears that after adverse action by the Contract Adjustment Board and the Secretary of War, referred to in the findings, Colonel Mor-den wrote, to the Secretary of War a very strong letter in which he stated that he had represented to the subcontractors that the work would be completed and that they would earn their full maximum fee of $25,000 each and that if the work should be terminated or suspended the rate of compensation would be fixed in accordance with Articles YIII and III of the prime contract, and Colonel Morden in this letter vigorously asserted that the Government should live up to the contract as he had made it and that it had become with him a matter of personal and official honor.
The work was terminated before completion and upon submission of the final statement by the plaintiff it was reported that the amount of work done by Lasette & Murphy was $287,875.00, on which they were entitled to a subcontractor’s fee of six and one-half per cent, or $18,879.36, and that the amount of work done by Gillis & Geoghegan was $343,583.40, on which, at six and one-half per cent, they were entitled to a fee of $21,511.13. Fees were allowed to the plaintiff for the subcontractors on the basis of five per cent upon the amounts of work done instead of six and one-half per cent, a difference in the case of Lasette & Murphy of $4,310.60 and in the case of Gillis & Geoghegan of $4,964.10. The five per cent fees allowed to the plaintiff for the subcontractors were received by the plaintiff and paid over to the subcontractors, and the plaintiff, who had received for itself all that was due it under the prime contract, here sues for the sums stated for the use and benefit of these subcontractors.
It is quite apparent that had the work contemplated by the subcontracts been fully performed there could have been no room for dispute, since whether the pi’ogress payments were made upon a basis of six and one-half per cent or five per cent the maximum fee in either event would have been attained, and in this connection it is apparent that, without intending thereby to affect the ultimate amount of compensation, there may have been a reason for the changing of the progress payments from a six and one-half per cent to a five *158 per cent basis to be found in the desirability of so limiting the progress payments that the maximum fee would not be attained long before completion of the work. In view of this situation as to the results had the work been completed, it is apparent that the question involved arises only because of the suspension of the work before completion.
It is desirable to note the interlocking character of the prime and the subcontracts requiring, so far, at least, as the subcontracts are concerned, that they and the prime contract be construed together, practically as one contract. For the purposes of the present case it is to be noted that the subcontracts contained the provision that “ said principal contract is hereby adopted and made a part of this contract and a copy thereof is hereto attached,” and that by virtue of the provisions of Article III of the subcontracts the pi*ime contractor thereunder is placed in the position occupied by the United States under the prime contract and the subcontractors are placed in the position of the contractor under the prime contract. Article III of the prime contract contains a schedule of fees and that schedule of fees is referred to in the subcontracts. It is to be noted further that the subcontracts contain no specific, provision authorizing the abandonment of the contracts and prescribing the basis of settlement in such a contingency, but that provision therefor is made in Article VIII of the prime contract.
There are two possible views of the situation presented each, however, resulting in the same conclusion. First, in view of what has been said with reference to the interlocking character of the two contracts, the provision specifically making the prime contract a part of the subcontracts, and the absence from the subcontracts of any specific provision for the abandonment of the work and the settlement with the subcontractors in that event, it seems clear that upon abandonment of the work reference for the authority therefor, as well as for the basis of settlement in that event, must be found in Article VIII of the prime contract. Under this provision each of the subcontractors here involved were entitled to a fee of six and one-half per cent upon the ascertained amount of work done by them under their subcontracts. Second, there is inconsistency, such *159 perhaps as might be denominated a conflict in the provisions of Article VI of the subcontract with reference to the fees of the subcontractor. There was no inconsistency in this article as originally appealing in the printed form since it referred to Article III of the prime contract as the only basis for the determination of the subcontractor’s fees. As modified, that article provides that “the contractor shall pay to the subcontractor such sum as the contracting officer may approve and allow the contractor according to the schedule of fees contained in the principal contract for a feo upon the work hereby included,” followed by the provision, after the amendment by Colonel Morden, that “the amount of fees to be paid by the contractor to the subcontractor shall be five per cent of the cost of the work as determined by Article II of the principal contract.” These two provisions .in the subcontracts as executed are so in conflict that it seems that there can be no doubt of the application of the rule that in the event of ambiguity in the provisions of a contract or, as here, conflicting provisions in a contract, parol testimony is admissible for the purpose of explaining the terms of the contract as understood by the parties at the time of its execution. It is not deemed -worth while to cite any of the many authorities in support of this rule. So far as the facts of the case are concerned there is no room for doubt. As already stated, it was the clear intent of the parties that the five per cent provision should be applicable only as a measure of progress payments, immaterial otherwise because upon completion of the work the five per cent would exceed the maximum fee to be allowed, and that in the event of a suspension of the work before completion the provisions of Article VIII of the prime contract should apply.
No question is made in the case of the right of the plaintiff herein to sue for the use and benefit of these subcontractors and there would seem to be room for no question as to that right. The contracts read together indicate clearly that the rights of the subcontractors, both as to reimbursement of expenditures and payment of fees, were necessarily to be worked out through the prime contractor.
*160 We conclude that for the use and benefit of Lasette & Murphy the plaintiff is entitled to recover $4,310.60, and for the use and benefit of Gillis & Geoghegan $4,964.10, and we have directed judgment accordingly.
Graham, Judy a; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.